# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

———————————————————————————————

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                     Case No. 07-CR-153

JOEY L. MARSHALL,

        Defendant.

———————————————————————————————

# ORDER

On June 19, 2007, a grand jury sitting in the Eastern District of Wisconsin returned a two-count indictment charging the defendant Joey Marshall with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922 and 924 (Count One); and knowingly and intentionally possessing a firearm in violation of 18 U.S.C. §§ 922 and 924 (Count Two). On August 10, 2007, Marshall was arraigned before Magistrate Judge Aaron E. Goodstein and entered pleas of not guilty to both counts. On August 30, 2007, Marshall, through his attorney, filed a motion to suppress all evidence seized from his vehicle and person on May 5, 2007. On November 6, 2007, Magistrate Judge Patricia Gorence issued a recommendation to this court that Marshall's motion to suppress be granted. The government filed an objection to the recommendation, and Marshall has filed a response.

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(B), a magistrate judge may consider dispositive motions, such as motions to suppress, and issue recommendations to the district judge regarding the motions. *See id.* When a party objects to a magistrate's

findings, the district court judge must make *de novo* determinations as to these findings. *See id.* § 636(b)(1)(C); *see also Delgado v. Bowen,* 782 F.2d 79 (7th Cir. 1986). The district court may adopt the recommendation in part or in its entirety and has the final authority of judgment in the case. *Delgado*, 782 F.2d at 82. If necessary, the district court "may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1). The court has reviewed the evidence and transcripts from the evidentiary hearings and finds them sufficient to make factual and credibility determinations on those records alone. For the reasons set forth below, the court is obliged to adopt Magistrate Gorence's recommendation in its entirety and grant Marshall's motion to suppress.

## BACKGROUND

On September 12, 2007, Magistrate Gorence conducted an evidentiary hearing on Marshall's motion to suppress. At that time, Milwaukee Police Officers Gilbert Collado, Jr., and Richard Wearing testified on behalf of the government. The hearing was continued to September 24, 2007, at which time Officer Mark Harms also testified on behalf of the government. The following represents a brief summary of the officers' testimony.

### I.      Officer Gilbert Collado

Officer Gilbert Collado testified that he has been employed as a law enforcement officer for the City of Milwaukee for over 16 years. He is currently assigned to the Fugitive Apprehension Unit within the Intelligence Division of the Milwaukee Police Department. He typically works with his partner, Officer Richard

2

Wearing, and looks for individuals wanted on outstanding arrest warrants. (September 12, 2007 Evidentiary Hearing Tr. 6-7) (hereinafter "Tr. I.")

Collado was on duty on May 5, 2007, and he was on patrol in the area of 30th Street and Vine Street in Milwaukee, Wisconsin. Collado was in uniform but driving an unmarked Ford Crown Victoria. (*Id.*) Collado testified that he and his partner were in this neighborhood because they had been told that there was an individual with a firearm in his vehicle. (*Id.* at 7-8.) Another officer within the Intelligence Division, Officer Mark Harms, supplied this information, and he gave a general description of the vehicle the individual would be driving. Collado located a vehicle traveling westbound that matched the description in the 2900 block of Vine Street. The individual in question was subsequently identified as Joey Marshall. (*Id.*)

Collado described the neighborhood around 30th and Vine as a high crime area, and noted that there was a high incidence of drug and firearm offenses and homicides in that area. The area is labeled by the Milwaukee Police Department as "District III," and is the area to which Collado is assigned. Collado stated that due to the high crime associated with District III, "you are on your toes" when patrolling that location. (*Id.* at 9.)

Collado's car was coming from the east when he and Wearing located Marshall's vehicle. After they got behind the vehicle, they believed that it did not stop at the intersection on 30th Street and West Vine Street. Marshall's vehicle turned onto North 30th Street and as Collado came around the corner to follow the car, and approximately two blocks from where they initially observed the car, they

activated their lights and siren to pull the car over. During this time, Collado and his partner were observing the vehicle and noticed the passengers inside moving around and either taking something from his waistband or picking something up from the bottom of his seat. These actions concerned Collado. (*Id.* at 10-11.)

After Marshall's vehicle stopped, both Collado and his partner got out of the vehicle and Collado approached the driver's side. Collado asked Marshall if he had I.D., and Collado testified that Marshall responded, "that he did not have I.D., or did not have a driver's license. I'm not sure which one it was." Collado said Marshall did not produce a driver's license, and further stated that he did not even have one. (*Id.* at 12-13.)

At this point, Collado took Marshall out of the vehicle. Marshall was patted down and placed in handcuffs. No weapons were found, although Collado stated he had a large amount of cash on him. Collado asked if there was anything in the vehicle that should not be, and Marshall responded that there was a firearm in the car. Officer Wearing searched the vehicle and recovered the firearm. However, Collado testified that when the reports were written up, neither officer made mention of the confidential informants' tip about the firearm. Collado stated this was done at the request of Officer Harms, and to protect the identity of the confidential informant. (*Id.* at 15.)

On cross examination, Collado testified Sunday, May 5, 2007, was a clear and nice day in Milwaukee. Collado stated that he and his partner received information from Officer Mark Harms in the Intelligence Division that an individual would be

4

traveling with a firearm in the car. This information was provided approximately one hour prior to the arrest. Collado also testified the he received this information directly from Harms, whose identity was not confidential. (*Id.* at 17-19.)

Collado was then shown a video depicting the 30th and Vine Street area in Milwaukee, Wisconsin. The video traced the area Collado had previously testified he and Wearing observed and followed Marshall's vehicle. At the intersection previously described by Collado, no stop sign existed. Collado explained this inconsistency by testifying, "that doesn't mean that there wasn't a stop sign there that day. It's very common for signs to disappear, get knocked down, and the City just doesn't – it takes time to put it back, or it does come back at a certain time, but there was a stop sign there that day." (*Id.* at 22.) Collado was also shown a certified and notarized map of the area in question, admitted into evidence as Exhibit 2. This map depicted the intersections in the neighborhood and at each intersection that was controlled by a stop sign, a red octagon was present. Exhibit 2 showed that there was no stop sign at the 30th and Vine Street intersection.

Defense counsel also presented an exhibit depicting a copy of Marshall's driver's license. This copy was accompanied by a certificate from the Department of Transportation acknowledging that it was a true and correct copy of the original, and that Marshall's license was issued in 2004 and expired in 2012. Additionally, defense counsel offered as an exhibit an inventory of items recovered from Marshall, including his driver's license. (*See id.* at 26-29.)

On redirect examination, Collado further testified that while there was not a stop sign in the video produced by defense counsel, he believed that there was a stop sign at that location on May 5, 2007, and he was also quite certain that the intersection in question was in fact the 30th and Vine Street intersection. (*Id.* at 41-42.) Collado also testified that Marshall had two outstanding arrest warrants with the Milwaukee County Sheriff's Department. On final redirect examination, Collado testified that Marshall was already in handcuffs when Collado asked him his name. (*Id.*)

## II.     Officer Richard Wearing

Officer Richard Wearing testified that he is a police officer for the City of Milwaukee and has held this position since 1993. Wearing's current assignment is with the Fugitive Apprehension Unit, and he was on duty on May 5, 2007. His location was in the area of 30th and Lisbon in Milwaukee, Wisconsin. (*Id.* at 44.) He testified that he was in this area based upon information fellow Officer Mark Harms provided; that an individual in a light blue Buick Park Avenue would be in the area of 30th and Vine. (*Id.* at 46.)

Wearing testified that he and Collado initially observed the Marshall's vehicle by 29th and 30th Streets in Milwaukee, Wisconsin. Wearing stated the vehicle was traveling westbound, turned northbound, and disregarded a stop sign at 30th and Vine. (*Id.* at 48.) Collado was driving the car, and upon observing what they believed to be a traffic violation, he sped up, got behind the vehicle, and activated their car's emergency lights. Marshall's car drove roughly one block and pulled over

Case 2:07-cr-00153-JPS     Filed 01/14/08     Page 6 of 24     Document 40

to stop. (*Id.* at 49.) Wearing also testified that Marshall made movements in the car that concerned him, specifically because Wearing thought Marshall may be attempting to conceal a handgun or narcotics.

After pulling Marshall over, Collado approached his car and began talking to him. During this time, Wearing was paying attention to the interior of the vehicle and seeing if Marshall was making any "weird movements." (*Id.* at 51.) After Collado spoke with Marshall, he placed Marshall in handcuffs and escorted him to the squad car. Wearing was speaking with the passenger of the car, September Marshall, and he asked her to exit the vehicle. Collado then advised Wearing that there was a firearm under the passenger seat.

Wearing testified that they did not include information from Harms about the informant's tip in the subsequent arrest report because "there was no immediate information for us to put in there. He gave us the information, we observed a traffic violation, and conducted our investigation from there." (*Id.* at 55.) It was Wearing's decision not to put this information in the arrest report. Wearing was then shown the certified record that the 30th and Vine Street intersection was uncontrolled; however, he maintained that he was certain there was a stop sign at that intersection. (*Id.* at 56.)

On cross-examination, Wearing testified that the informant's tip was not the reason Marshall's car was stopped, it was because of the traffic violation at 30th and Vine Streets. Wearing also testified that he was contacted by Harms regarding the tip, not Collado. Wearing stated that there were no supplemental reports prepared

regarding any of the discussions or information he had from Harms about the tip. (*Id.* at 67.)

### III. Officer Mark Harms

Officer Harms testified at the continuation of the evidentiary hearing held on September 24, 2007. Harms testified that he has been employed by the Milwaukee Police Department for approximately ten years. Harms is currently assigned to the intelligence division and works with the gang squad and has worked in this capacity since April 2004. Harms has been working with confidential informants for approximately five years. (September 24, 2007 Evidentiary Hearing Tr. 3-4) (hereinafter "Tr. II.")

Harms testified that although he was not working on May 5th, 2007, he had telephone contact with a confidential informant and Officer Wearing. (*Id.*) The confidential informant, whom he had been working with for approximately ten months, called to inform in that an individual was playing basketball at 2915 West Vine and he was in possession of a firearm. Harms stated that the confidential informant provided him with the individual's name, physical description, the type of clothing the individual had, and the vehicle he was driving. Harms passed this information onto Wearing. (*Id.* at 6-7.) Harms stated that he relayed all of the information provided to him to Wearing, but he did not author any reports regarding this incident.

On cross-examination, Harms testified that the confidential informant informed him that he saw the firearm in the individual's waistband. Harms also stated that he

8

was informed about the individual's whereabouts because the informant was calling him with updates. (*Id.* at 11-12.) Harms stated that although he originally had personal notes about what the confidential informant was telling, those have since been destroyed. Harms testified that in reference to these evidentiary hearings, he was concerned about exposing the identity of the confidential informant. (*Id.* at 22.) Harms also testified that in 2002, he was arrested for lying to a police officer, but that no charges were filed.

During redirect examination, Harms testified that when he received information about the arrest on May 5, he did not indicate to either Collado or Harms that he wanted the informant protected. (*Id.* at 23.) He said the officers were aware that the information was coming from a confidential informant, "but there wasn't a conversation about protecting the CI at that time. That's just common knowledge in our business." (*Id.* at 24.)

## IV.    Evidence

During the hearings, a number of exhibits were offered and received in evidence. Those items received as exhibits included: (1) a video tape of the route the officers testified following Marshall; (2) a notarized map of the area with red octagons depicting where stop signs are located in the area; (3) a photograph of Marshall's driver's license; (4) a letter from the Department of Transportation with an abstract of Marshall's driving record; (5) the May 5, 2007 jail identification and property record for Marshall; (6) the May 5, 2007 property receipt for Marshall; (7) Marshall's arrest-detention report; (8) a September 10, 2007 letter from the

9

Department of Public Works in Milwaukee, Wisconsin, stating that the intersection at West Vine Street and North 30th Street is not controlled by a stop sign; and (9) a stipulation that there is no stop sign at the intersection of West Vine Street and North 30th Street.

## ANALYSIS

In Marshall's motion, he sought suppression of the firearm seized on May 5, 2007, and argues that he was stopped without consent, probable cause, or reasonable suspicion. Magistrate Gorence concurred with Marshall's arguments and recommended that his motion be granted. The government challenges several key determinations addressed in the recommendation: (1) the recommendation's finding that the reason for the stop of the defendant's vehicle was the traffic violation; (2) the recommendation's finding that Officer Collado testified that Marshall did not have a driver's license; (3) the recommendation's finding that there is no support in the record that the officers understood that they were to obtain independent cause to stop Marshall's vehicle; (4) the recommendation's finding that Collado was "not credible"; (5) the recommendation's finding that the information provided by Officer Harms could have been included in the report without revealing the confidential informant's identity; (6) the recommendation's conclusion that the firearm information could not have been a basis for probable cause; and (7) the recommendation's finding that the arrest warrants could not justify the seizure of the firearm. The court will address each of the government's objections below.

The government argues that the magistrate erred in finding that the reason for the purported stop was Marshall's failure to stop at a stop sign; rather, the government argues that the record supports that the officers stopped Marshall because of the tip about the firearm. The court takes exception to the government's position and finds that the magistrate's recommendation is amply supported by the testimony and evidence.

Both Wearing and Collado testified that the reason for stopping Marshall's car was his alleged failure to stop at the 30th and Vine Streets intersection. Collado testified as follows:

> Q: Okay. What happened after you saw the vehicle not make the stop and proceed onto North 30th Street?
> A: As the vehicle proceeded on North 30th Street, we came around the corner. We activated our lights and sirens and the vehicle stopped roughly two blocks from where we initially saw it. North – right before North Avenue it stopped.
> Q: What were you stopping the vehicle for?
> A: The fact that it – there was going to be a subject in there with a gun and the stop sign violation.
> Q: The traffic violation you observed?
> A: Correct.

(Tr. I-11.)

Wearing similarly testified that the failure to stop at the stop sign prompted the arrest.

> Q: So you observed this vehicle parked westbound – facing westbound on Vine between 29th and 30th. Two subjects enter the vehicle. What happened after that?
> A: The vehicle drove westbound and turned northbound, disregarding the stop sign at 30th and Vine.
> . . .
>
> Q: What did you and your partner do in response?

11

> A:   We sped up, got behind the vehicle, and activated our squad
>       lights.  The red and blue lights.  The emergency lights.

(*Id.* at 48-49.)

Each officer testified that Marshall's failure to stop at the stop sign was the reason they activated their lights and pulled him over.  Furthermore, the court determines that the facts support this finding; if the officers were actually stopping Marshall based upon the informant's tip, they could have done so upon first observing the car and would not have needed to wait for Marshall to commit the alleged traffic violation.

Additional support for this finding may be found in the arrest reports received in evidence. (Ex. 7.)  In both the details of arrest and supplement report sections, it states that Marshall was stopped because of a traffic violation; specifically, his failure to come to a complete stop at the intersection at 30th and Vine Street.  (*Id.*)  Based upon the officers' testimony, their actions in actually arresting Marshall, and the post-arrest reports they wrote themselves, the court finds that the entire record more than adequately supports the finding that the officers stopped Marshall based upon his alleged failure to stop at the intersection of 30th and Vine Streets.

Next, Marshall objects to the magistrate's finding that Collado testified that Marshall did not have a driver's license.  When asked questions regarding Marshall's driver's license, Collado testified as follows:

> A:   I engaged in asking the driver if he had I.D. and he replied that
>       he did not have I.D., or did not have a driver's license.  I'm not
>       sure which one it was.
> Q:   Did he produce a driver's license?
> A:   No.

Q:     Did he have a driver's license?
A:     No.

(Tr. I-12-13.)

On cross-examination, Collado similarly testified that Marshall indicated he had no driver's license. (*Id.* at 25.) The government objects to the magistrate's conclusion and argues, "[a] fair reading of the officer's testimony is not that he testified that the defendant did not have a driver's license, but that the defendant said that he did not have I.D. and did not produce a driver's license." (Gov't Obj. 4.) The court disagrees with the government's characterization of the testimony, and specifically points to Collado's negative response when asked, "[d]id he have a driver's license?" (*Id.* at 13.) After carefully reviewing Collado's testimony on both direct and cross-examination, the court finds that he did indeed testify that Marshall did not have a driver's license, and that the government's objections to the magistrate's findings on this point are without merit.

The government also argues that the recommendation was incorrect insofar as it concluded that Collado's testimony was unreliable. However, the court concludes that the magistrate's finding was more than reasonable particularly when the testimony given by Collado is squared against other unimpeachable – thus more convincing – evidence to the contrary.

First, Collado unequivocally testified that there was a stop sign at the intersection of 30th Street and Vine Street in Milwaukee, Wisconsin. Even after he saw a video of the area and a certified city record depicting that the intersection was uncontrolled by a stop sign, he continued to assert that he could not have been

13

mistaken about the existence of a stop sign. His only response was that "[i]t's very common for signs to disappear, get knocked down, and the City just doesn't – it takes time to put it back, or it does come back at a certain time, but there was a stop sign there that day." (Tr. I-22.) The court finds his statements difficult to believe in light of the notarized map of the City of Milwaukee depicting each stop sign that exists in the 30th and Vine Streets area, and, as referenced above, showing that the intersection in question was uncontrolled. (*See* Exs. 1-2; 8-9.)

Furthermore, Collado's testimony that Marshall did not have a driver's license is also inconsistent with items admitted into evidence. Exhibits 3 and 4 depict a photograph of Marshall's license and an abstract from the Wisconsin Department of Transportation that his license is current and would have been valid on May 5, 2007. Marshall's jail inventory from that day also includes his license, which makes Collado's testimony even more questionable. Even if Collado's statements were mistakes and not open attempts to conceal the truth, they do make Collado's testimony unreliable and lacking in credibility.

The government also objects to the magistrate's finding that there is no support in the record for the government's assertion that the officers who stopped the defendant's vehicle "understood that they were to obtain independent probable cause to stop Marshall's vehicle." (Govt. Obj. 5.) The government asserts that in order to protect the confidential informant, the officers had to find an independent reason for stopping Marshall. (*Id.*) The government's position is not supported in the record however, since neither Collado nor Wearing testified that they were instructed

14

to find an alternate reason for stopping Marshall's vehicle, and Harms did not testify that he instructed the officers to find an alternate reason to stop Marshall.

The government also objects to the magistrate's finding that the information regarding the confidential informant's tip could have been included in the reports without revealing the identity of the informant. Once again the court takes exception to the government's position. Clearly, it would have been an easy task to obliquely mention that the knowledge of a firearm came from a reliable confidential informant if the officers truly relied on upon this information in arresting Marshall. Furthermore, the report could have included firearm information without even mentioning the confidential informant and stating that fellow Officer Harms supplied the intelligence. The court is not minimizing the importance of protecting confidential informants; rather, the court is simply noting that the information could have been referenced in a variety of ways without ever exposing the identity of the informant.

Next, the government argues that the magistrate erred in finding that the informant's tip could not have formed the basis for probable cause to arrest Marshall. The government further argues that this tip could have provided probable cause to arrest Marshall for carrying a concealed weapon, an arrestable offense. As will be discussed below, the government's position is without merit.

Significantly, neither officer testified that the reason for stopping Marshall was based upon the tip from the confidential informant. As noted above, although Collado referenced the tip, his testimony clearly indicated that the reason for the stop was Marshall's alleged traffic violation. Furthermore, Wearing testified that the

Case 2:07-cr-00153-JPS   Filed 01/14/08   Page 15 of 24   Document 40

informant's tip was simply the reason they were in the neighborhood at all, not the reason for the stop.

> Q: And did you – is it fair to say that you relied upon that information [from Officer Harms] in deciding to stop the vehicle? As part of the calculus you had?
>
> A: The information on stopping the vehicle was on observations of a traffic violation. But that was part of why we were in that area, was looking for the vehicle.

(Tr. I-58.)

Moreover, the arrest report prepared for Marshall and admitted into evidence as Exhibit 7 states that the reason for the arrest was the alleged traffic violation for the failure to come to a complete stop at a stop sign. The arrest reports are silent with respect to any confidential informant tips, and, as the court concluded above, it would have been entirely possible to reference the tip without exposing the confidential informant.

Even if, as the government argues, the officers did rely on the confidential informant's tip in arresting Marshall, the court finds that this tip could not have supplied the requisite probable cause, or even reasonable suspicion, to arrest Marshall. Officers have probable cause to arrest an individual when reasonably trustworthy facts and circumstances within their knowledge are such that a prudent person would believe that the individual committed or was committing an offense. *United States v. Jones*, 72 F.3d 1324, 1331 (7th Cir. 1995). Officers have reasonable suspicion to stop and question an individual at a standard less demanding than probable cause, *see United States v. Quinn*, 83 F.3d 917, 921 (7th Cir. 1996); however, an "inchoate and unparticularized suspicion or 'hunch' " will not

suffice, as there must be "some minimal level of objective justification for making a stop." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).  After a thorough review of the record, the court finds that the informant's information lacked the "objective justification" necessary for reasonable suspicion to stop Marshall's vehicle.  As will be discussed below, the court also finds that the requisite probable cause was not present, and, therefore, the officer's arrest of Marshall could not have been lawful on the basis of the informant's tip.

The Seventh Circuit has held that an informant's tip may justify probable cause; however, it must be sufficiently trustworthy, detailed, corroborated by other facts, and accurate.  *See United States v. Navarro*, 90 F.3d  1245, 1254 (7th Cir. 1996).  A tip is to be evaluated under the "totality of the circumstances" standard and should be corroborated by police work.  *See United States v. Banks*, 405 F.3d 559, 570 (7th Cir. 2005) (citing *Illinois v. Gates*, 462 U.S. 213, 241-45 (1983)).

Although Officer Harms testified that this informant was an individual he had worked with on prior occasion and had previously provided reliable information, the court finds that this is the only factor that supports a finding of reliability and probable cause under the totality of the circumstances.  Other factors weigh heavily against a finding of probable cause.  To begin, the information provided to the officers was somewhat sparse in detail.  Although Harms testified he provided information such as the make and color of the vehicle, Marshall's physical description, and whether or not Marshall would be with anyone, each of the officers had a rather difficult time recalling any of these distinguishing factors.  Although the court appreciates that this

Case 2:07-cr-00153-JPS   Filed 01/14/08   Page 17 of 24   Document 40

testimony was a few months after the incident, it is important to note that not one of the officers kept a written account of the information provided by the confidential informant, therefore making it difficult to determine what was precisely communicated to the arresting officers. Furthermore, the information Harms provided was conclusory in nature. He simply relayed information that an individual observed that Marshall had a firearm and was playing basketball in the area of 30th and Vine Streets. The court also finds that this information was not corroborated by the officer's observations prior to the illegal arrest. At best, the officers testified that they saw Marshall fidgeting with his waistband, but this is an extremely equivocal action that cannot amount to corroborating the tip that Marshall was armed.

The court also finds that it would be inappropriate to impute the knowledge of Harms to Collado and Wearing. Under the "collective knowledge doctrine," the knowledge of one officer may be imputed to arresting officers if they are in communication with one another regarding a suspect. *United States v. Ellis,* 499 F.3d 686, 690 (7th Cir. 2007) (citing *Reynolds v. Jamison*, 488 F.3d 756, 768 n. 7 (7th Cir. 2007)). However, in this instance, Collado and Wearing both testified that the reason for the arrest was Marshall's traffic violation. The arrest reports support this testimony as well. In order for Harm's knowledge to be imputed to the arresting officers, they would have had to rely upon it in effectuating their arrest. They did not; as noted several times above, the stated reason for their arrest was the traffic violation, not the firearm possession.

Case 2:07-cr-00153-JPS   Filed 01/14/08   Page 18 of 24   Document 40

Lastly, the government objects to the magistrate's finding that Marshall's outstanding arrest warrants could not justify the seizure of the firearm. The government argues that even if the court determines that the stop was unlawful, the evidence obtained during the search of Marshall's vehicle should not be suppressed because he had two outstanding arrest warrants, and the discovery of these warrants was an independent and intervening circumstance rendering suppression of the evidence unnecessary.

"Evidence may be 'sufficiently distinguishable to be purged of the primary taint if the causal connection between [the] illegal police conduct and the procurement of [the] evidence is so attenuated as to dissipate the taint' of the illegal action." *United States v. Green*, 111 F.3d 515, 520-21 (7th Cir. 1997) (quoting *United States v. Liss*, 103 F.3d 617, 620 (7th Cir. 1997) (internal citations omitted)). The Supreme Court has set forth three factors a court is to consider in determining whether the chain has been sufficiently attenuated to purge the taint of the illegal conduct. *See Brown v. Illinois*, 422 U.S. 590, 603-04 (1975). These factors include: (1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the police misconduct. *Id.* In addition to these considerations, the court must always consider whether the evidence was discovered from "the exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

As to the first *Brown* consideration, the court finds, as did the magistrate, that there was virtually no elapse of time between the illegal stop and the discovery of the firearm. The officers testified that there was only a few minutes between the initial stop and the search and discovery of the firearm. Although this factor is not dispositive, it weighs against a finding that the discovery of the firearm was sufficiently attenuated to the illegality. *See Green*, 111 F.3d at 521.

As to the next consideration, the presence of intervening circumstances or events, the court similarly finds that this *Brown* factor weighs against a finding of sufficient attenuation. Although the court has determined that the initial stop of Marshall was illegal, he was wanted on two outstanding and valid arrest warrants. The Seventh Circuit has held that the discovery of valid arrest warrants can serve as an intervening circumstance that would purge the taint of the initial illegality. *See id.* Indeed, the *Green* court stated that "[i]t would be startling to suggest that because the police illegally stopped an automobile, they cannot arrest an occupant who is found to be wanted on a warrant." *Id.*

However, there are important and distinguishing factors in the present case that differentiate it from the result in *Green*. In *Green*, officers observed a Chevrolet driven by David Green, with his brother, Avery Green, riding in the passenger's seat. *Id.* at 517. The officers recalled that the same car had been parked in front of Mark William's residence the previous night. *Id.* Williams was wanted on a federal warrant, and the officers believed that the occupants of the car may have had information about Williams' whereabouts. *Id.* The officers followed the Chevrolet,

and when it pulled into a driveway, the officers blocked the car by parking their cruiser across the driveway. *Id.*

The officers got out of the car and asked both Greens for identification. After the officer's obtained their identification, a computer search revealed an outstanding warrant for Avery, and the officers arrested him. The officers searched the vehicle and, during the search, the officers discovered crack cocaine and a firearm; pursuant to the discovery of these items, the officers arrested David Green. *Id.*

The Seventh Circuit upheld the denial of David Green's motion to suppress the evidence found during the search of the car. As a preliminary matter, the Seventh Circuit ruled that the initial stop of Green's vehicle violated the Fourth Amendment. *Id.* at 520. However, the court determined that the cocaine evidence was admissible because the connection between the initial police misconduct and the procurement of the evidence was sufficiently attenuated to dissolve the initial illegal taint. *See id* at 520-21. The *Green* court analyzed the three *Brown* factors and, under that framework, determined that the search after the arrest on a warrant was an intervening circumstance that sufficiently attenuated the evidence from the officers' Fourth Amendment violations in illegally stopping Green's car. *Id.*

Readily distinguishable from the fact pattern in Marshall's case are two important factors. First, in *Green*, the subject of the officers' initial investigation and reason for stopping Green's car was Williams; it was never either of the Greens. This is important because the "intervening circumstances" exception takes into consideration the purpose of an officer's illegal stop. *See id* at 523; *see also Brown*,

Case 2:07-cr-00153-JPS   Filed 01/14/08   Page 21 of 24   Document 40

422 U.S. at 603-04. In contrast, Collado and Wearing initially and continually targeted Marshall as the subject of their investigation. Another significant factor is that the search of Green's car was conducted after a lawful arrest. Here, the search of Marshall's vehicle was conducted pursuant to an unlawful arrest and before the discovery of the outstanding arrest warrants. Therefore, the taint of the original illegality did not dissipate as it did in *Green. See id.*; *see also United States v. O'Connell,* 408 F. Supp. 2d 712, 727 (N.D. Iowa 2005) (granting a motion to suppress on a similar fact pattern where a search was conducted pursuant to an illegal arrest, and *not* pursuant to a search after the discovery of outstanding arrest warrants). Accordingly, the court finds that the *Green* case presents substantial differences from the facts in the instant case, and, therefore, does not support a finding that the discovery of Marshall's arrest warrants serve as an intervening circumstance that would sever the taint of the officer's illegal misconduct.

The final consideration addressed in *Brown*, determining the purpose and flagrancy of the police misconduct, has been consistently referred to as the most important consideration "because it is tied directly to the rationale underlying the exclusionary rule, deterrence of police misconduct." *United States v. Reed*, 349 F.3d 457, 464-65 (7th Cir. 2003) (citing *Brown*, 422 U.S. at 600). The conduct does not need to be outright threatening or coercive; "purposeful and flagrant" behavior can arise from bad faith and circumstances where "the police lack an arguable basis for the detention." *Reed*, 349 F.3d at 465. Other circuits have determined that the admonishment against that "purposeful and flagrant" conduct in *Brown* may be

Case 2:07-cr-00153-JPS   Filed 01/14/08   Page 22 of 24   Document 40

demonstrated when "the arrest, in design and execution, is investigatory in nature." *United States v. Shaw*, 464 F.3d 615, 631 (6th Cir. 2006). Here, the court does find that the officer's conduct was tantamount to acting in bad faith and lacked any arguable basis for detaining Marshall because it appears that the arrest was investigatory in nature. *See id.* The initial reason for stopping his car was due to his failure to stop at a non-existent stop sign; not only is this a serious mistake on behalf of the officers, it appears that it was used as a proxy to gain more information about Marshall that was wholly unrelated to the traffic violation. As the court previously noted, the informant's tip was not sufficient to supply reasonable suspicion or probable cause, and the officers appeared to be on the sort of "fishing expedition" prohibited by the *Brown* court. *See Reed*, 349 F.3d at 465-66 (noting the court should "examine whether the actions were undertaken in an effort to advance the investigation or to embark on a fishing expedition in the hopes that it would lead to a confession or other useful evidence" because these actions "would undermine the purpose of the Fourth Amendment, and therefore are relevant to this analysis that ultimately examines whether suppression is necessary for purposes of deterrence or judicial integrity"). Indeed, absent probable cause, the police may not simply seize a person; "[u]nwarranted detentions following illegal seizures may demonstrate the type of purposeful and flagrant conduct the exclusionary rule was designed to prevent." *Id.* at 465.

In conclusion, the court is obliged to adopt the magistrate's findings and recommendation that the discovery and seizure of the firearm was the result of an

Case 2:07-cr-00153-JPS   Filed 01/14/08   Page 23 of 24   Document 40

unconstitutional traffic stop. It is the government's responsibility to demonstrate that evidence obtained is not "fruit of the poisonous tree," and here, the court determines that the government has not met its burden. *See United States v. Crouch*, 528 F.2d 625, 629 (7th Cir. 1976). The Fourth Amendment exclusionary rule is to "deter unreasonable searches, no matter how probative their fruits." *United States v. Patino*, 830 F.2d 1413, 1419-20 (7th Cir.1987). In light of the record, including the illegal stop and the fact that there were no intervening circumstances that would warrant an exception to exclusion, the court finds that it is necessary to invoke the rule and suppress the evidence obtained from the May 5, 2007, search of Marshall's vehicle.

Accordingly,

**IT IS ORDERED** that Magistrate Gorence's recommendation be and the same is hereby **ADOPTED**; and

**IT IS FURTHER ORDERED** that Marshall's motion to suppress [Docket #11] be and the same is hereby **GRANTED**.

Dated at Milwaukee, Wisconsin, this 14th day of January, 2008.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge